In the

# United States Court of Appeals

### For the Seventh Circuit

No. 23-1449

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERT SYLVESTER KELLY,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:19-cr-00567-1 — **Harry D. Leinenweber**, *Judge*.

_____

ARGUED FEBRUARY 22, 2024 — DECIDED APRIL 26, 2024

_____

Before SYKES, *Chief Judge*, and RIPPLE and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. For years, Robert Sylvester Kelly abused underage girls. By employing a complex scheme to keep victims quiet, he long evaded consequences. In recent years, though, those crimes caught up with him at last. But Kelly—interposing a statute-of-limitations defense—thinks he delayed the charges long enough to elude them entirely. The statute says otherwise, so we affirm his conviction.

## I. Background

The conduct underlying Mr. Kelly's conviction dates to the late 1990s and early 2000s. In those days, he worked in the music industry, primarily as a singer. Kelly sometimes worked with a singer called Sparkle. The two were also romantically involved.

The pair were not exclusive. To the contrary, Sparkle seems to have introduced Kelly to her teenage niece, starting Kelly along the yearslong process of grooming the young teenager. The niece, who had her own interest in a recording career, goes by "Jane" in this case. (She, like other victims discussed below, used a pseudonym at trial.) When Jane was thirteen or fourteen years old, she started visiting the Chicago studio where Kelly and Sparkle worked. Sparkle encouraged Jane to form a bond with Kelly. As part of that plan, one day she advised Jane to sit on Kelly's lap, rub his head, and ask him to be her godfather. Jane complied and Kelly agreed to take on the role.

In 1996 Kelly began taking advantage of his relationship with Jane. He started with explicit phone calls. Then when Jane was fourteen, Kelly began subjecting her to oral sex. That escalated to intercourse by age fifteen. The abuse continued throughout Jane's teenage years, and all the while Kelly memorialized his misconduct in a series of video recordings.

For much of this time Jane had a close friend, Pauline, who would sometimes visit Kelly's home. On one such visit she discovered Kelly abusing an undressed Jane. Kelly claimed he was checking Jane for bruises and then pressured Pauline to join in. Kelly proceeded to abuse both girls together, and would continue to do so for years, often calling both to his

studio and frequently recording these encounters. When the victims were sixteen, Jane discovered that Pauline had been seeing Kelly without Jane present. This spelled the end of Jane and Pauline's friendship. But Kelly continued his abuse of both girls, maintaining sexual contact with Pauline until after she finished college.

Around that same time, Kelly also groomed a girl named Nia, whom he had met while on tour in Atlanta. She was fifteen then. He gave her an autograph that included his phone number, later arranging for her to attend his concert in Minnesota. Kelly put Nia up in a nearby hotel and, the morning after the show, visited her room and sexually abused her. The next summer, when Nia was sixteen, she arranged to stay with family in Chicago and met Kelly twice at his studio. Kelly fondled her both times.

The government identified more abuse involving two other underage girls, here called Brittany and Tracy. Brittany was friends with Jane and Pauline; her story closely resembles Pauline's, down to the frequent group sex on camera. Tracy met Kelly through an internship and suffered abuse at Kelly's studio.

Some years after Kelly's abuse of these young girls began, Illinois law enforcement officials took an interest in Kelly. Their efforts culminated in a 2008 criminal trial for similar conduct Kelly allegedly committed against different victims. That jury acquitted Kelly. In the leadup to that trial—and afterward—Kelly and others worked to keep his abuse under wraps. For example, Kelly's production company cut checks to Jane's father before and after the 2008 trial. And going back to 2001, Kelly's associates had worked to recover some of Kelly's videotapes, hiring private investigators and paying off

third parties who possessed the tapes. Twice the group paid $200,000 or more in cash for tapes.

In 2019, federal prosecutors secured an indictment against Kelly. The thirteen counts included in the superseding indictment comprised four for producing child pornography, three for receiving child pornography, five for inducing each of Jane, Pauline, Nia, Brittany, and Tracy to engage in sexual activities, and one for obstructing justice in the state case. At the trial, the government put three videos of Jane and Kelly into evidence. Each depicted oral sex. The jury convicted Kelly of inducing Jane, Pauline, and Nia to engage in sexual activities, and convicted him on the three child pornography production counts corresponding to the three videos in evidence. The jury acquitted Kelly on the other seven counts.

At Kelly's sentencing, the district court calculated a Guidelines range of 135 to 168 months' imprisonment based on Kelly's criminal history category (III) and his offense level (31). A significant factor at sentencing was Kelly's 2022 conviction for similar conduct in New York and corresponding 30-year sentence. The district court grappled at length with its discretion to run its sentence concurrently or consecutively with the New York sentence. After considering Kelly's likely lifespan, the nature and circumstances of his crimes, Kelly's history and characteristics, deterrence, the need to protect the public from Kelly, and mitigating factors like Kelly's own childhood abuse, the district court varied upwards from the Guidelines to impose a sentence of 240 months. As a practical matter, though, the sentence added just twelve months to

No. 23-1449                                                              5

Kelly's incarceration. The district court ordered the other 228 months to run concurrently with the New York sentence.[1]

Kelly appealed.

## II. Analysis

Kelly raises three arguments on appeal: (1) a statute of limitations excuses him from liability on these six counts; (2) the district court should have severed his trial so that one jury decided the charges relating to Jane and another the rest of the charges; and (3) his sentence is improper both procedurally and substantively.

### A. Statute of Limitations

Today, the statute of limitations for sex crimes against children extends through the life of the victim. The text could not be clearer on that:

> No statute of limitations that would otherwise preclude prosecution for an offense involving the sexual or physical abuse, or kidnaping, of a child under the age of 18 years shall preclude such prosecution during the life of the child, or for ten years after the offense, whichever is longer.

18 U.S.C. § 3283. Jane, Pauline, and Nia are still alive—indeed, all three testified at trial. So if the present-day statute applies here, the verdict against Kelly is safe from a statute of limitations challenge.

---

[1] Kelly has also appealed that sentence. *See* Notice of Criminal Appeal, *United States v. Kelly*, No. 22-1481 (2d Cir. July 12, 2022).

Kelly, though, asks us not to apply it, instead submitting that a previous version of the statute with a shorter limitations period governs his case. Recall that Kelly's abuse of these victims took place in the 1990s and early 2000s. At that time prosecutors had to move faster: the statute of limitations barred prosecutions after the victim's 25th birthday. The law changed to the above-quoted version in 2003 with the PROTECT Act, thereby extending the window to the life of the victim. *See* Pub. L. 108–21, title II, § 202, Apr. 30, 2003. By that time Jane, Pauline, and Nia had all turned eighteen, though none had yet turned 25. Therefore, when the PROTECT Act passed in 2003, the government could have prosecuted Kelly for the abuse he had perpetrated against Jane, Pauline, and Nia while they were underage, even though the ongoing contact was not the illegal inducement of a minor.

Putting the pieces together, Kelly maintains that the old, pre-2003 statute of limitations should control. All the inducement of minors in this case, he points out, took place when he could expect a more generous statute of limitations.

The law does not support Kelly's position.

As a threshold matter, it is not unconstitutional to apply a newer statute of limitations to old conduct when the defendant was subject to prosecution at the time of the change, as Kelly was in 2003. Similarly situated defendants have argued the Constitution's prohibition on retroactive punishment bars this sort of change—without success. *See, e.g., United States v. Gibson*, 490 F.3d 604, 609 (7th Cir. 2007). Kelly has no constitutional argument that survives those cases.

Instead, he argues the district court misinterpreted the statute to reach conduct (like his) that predated its passage—a contention that hinges on the "presumption against statutory retroactivity." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 273 (1994). We assess arguments like this one in two stages. A "court's first task is to determine whether Congress has expressly prescribed the statute's proper reach." *Id.* at 280. If so, we carry out Congress's wishes. If not, we "must determine whether the new statute would have retroactive effect," and if it would, the "traditional presumption teaches that it does not govern." *Id.* By way of example, a statute that "would impair rights a party possessed when he acted" or "increase a party's liability for past conduct" brings that presumption into play. *Id.*

Here, Congress has spoken clearly, instructing us to apply the statute across the board. "No statute of limitations that would otherwise preclude prosecution for [child sexual abuse] shall preclude such prosecution during the life of the child." 18 U.S.C. § 3283. If we agreed with Kelly, we would be applying the pre-2003 statute to "preclude prosecution during the life of the child." *Id.* The statute commands otherwise, unambiguously and with no reservations. It is not for us to second-guess that directive.

None of Kelly's arguments to the contrary persuade us. First, he points to the "shall" language in the statute: "*shall* preclude such prosecution." *Id.* (emphasis added). Seizing on that one word, he urges that "[t]he word shall is a sign of the future tense." *Martin v. Hunter's Lessee*, 14 U.S. 304, 314 (1816). While "shall" does point to the future, here it points to a future "prosecution" rather than future conduct. § 3283. The "prosecution" Kelly complains of took place twenty years

after the PROTECT Act passed. It thus falls well within the statute's forward-looking scope.

Second, Kelly directs us to the statute's legislative history. But "legislative history can never defeat unambiguous statutory text." *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020). This statute is unambiguous. And even if some ambiguity lingered, the legislative history does not help Kelly. He points out that an earlier version of the bill used different language, providing that "the amendments made by this section shall apply to the prosecution of any offense committed before, on, or after the date of enactment of this section." Child Abduction Prevention Act, H.R. 1104, 108th Cong. § 202 (2003). The final version of the law did not include that language. Though Kelly asserts this proves Congress did not want the statute to apply to his case, a fuller picture of the statute's history belies that notion. Senator Leahy, who pushed to cut the language, did so to alleviate his doubts about the bill's "constitutionality," since it "would have revived the government's authority to prosecute crimes that were previously time-barred." 149 Cong. Rec. S5137, S5147 (Apr. 10, 2003) (statement of Sen. Leahy). Because Kelly was subject to prosecution in 2003, the Constitution was never at issue here, so this change to the bill does not help him.

By reaching this conclusion about § 3283's temporal range, we find ourselves in good company. Faced with the same statute, the Ninth Circuit held that "Congress evinced a clear intent to extend … the statute of limitations applicable to sexual abuse crimes." *United States v. Leo Sure Chief*, 438 F.3d 920, 924 (9th Cir. 2006). In like vein, the Eighth Circuit reached the same conclusion about a precursor statute of limitations under what was then 18 U.S.C. § 3509(k), which used nearly

identical language. (This is the pre-2003 version of the statute Kelly asks us to apply.) *See United States v. Jeffries*, 405 F.3d 682, 683 (8th Cir. 2005) ("No statute of limitation that would otherwise preclude prosecution for an offense involving the sexual or physical abuse of a child under the age of 18 years shall preclude such prosecution before the child reaches the age of 25 years."). *See also United States v. Maxwell*, 534 F. Supp. 3d 299, 314–16 (S.D.N.Y. 2021).

Because Congress specified that § 3283 reaches Kelly's conduct, we need not opine on the second step. We turn, then, to his second point of error.

**B. Severance**

Kelly faults the district court for conducting a singular trial on all the charges against him and denying his motion to sever the counts involving Jane from the rest, including his abuse of Pauline and Nia. Kelly complains of a prejudicial spillover impact of the video evidence relating to Jane on the other counts. He also asserts a "coerced testimony" theory, claiming that he would have liked to testify about the Nia and Pauline conduct but opted not to for fear of cross-examination about the Jane videos.

The Federal Rules of Criminal Procedure contemplate joinder of charges in most cases. "The indictment or information may charge a defendant in separate counts with 2 or more offenses." Fed. R. Crim. P. 8(a). Sometimes, though, severance is in order. If the joinder "appears to prejudice a defendant or the government, the court may order separate trials of counts." Fed. R. Crim. P. 14(a). District court judges enjoy "wide discretion in determining when the prejudice of joinder outweighs the benefits of a single trial." *United States*

*v. Jett*, 908 F.3d 252, 275 (7th Cir. 2018) (citations omitted). Kelly's spillover and coerced testimony theories are two ways a defendant might show the prejudice Rule 14 requires. But here, neither theory prevails—especially under the applicable abuse of discretion standard of review. *See United States v. Maggard*, 865 F.3d 960, 970 (7th Cir. 2017).

A heavy burden falls on Kelly, who must "establish that the denial of severance actually prejudiced him by preventing the jury from arriving at a reliable judgment as to guilt or innocence." *United States v. Ervin*, 540 F.3d 623, 629 (7th Cir. 2008).

At the outset, the spillover theory faces two hurdles: "the dual presumptions that a jury will capably sort through the evidence and will follow limiting instructions from the court to consider each count separately." *United States v. Turner*, 93 F.3d 276, 284 (7th Cir. 1996). Kelly can surmount neither. When the trial reached its end, the jury *did* "capably sort through the evidence"—it acquitted Kelly on seven counts. And "where, as here, the jury returns a guilty verdict on only some of the counts charged in the indictment, we can be confident that the jurors were able to sift the evidence and to weigh the merits of each count separately." *United States v. Peterson*, 823 F.3d 1113, 1124 (7th Cir. 2016) (cleaned up). Further still, the district court instructed the jury: "You must consider each charge separately. Your decision on one charge, whether it is guilty or not guilty, should not influence your decision on any other charge." We presume juries follow instructions, *Samia v. United States*, 599 U.S. 635, 646 (2023), and nothing here suggests otherwise. The jury was properly instructed and discharged its duty with care, acquitting on seven counts.

The coerced testimony theory fares no better. A defendant advancing such a theory must make "a convincing showing that he has both important testimony to give concerning one count and the strong need to refrain from testifying on the other." *Ervin*, 540 F.3d at 629 (cleaned up). Kelly never identifies what testimony he would have given about Pauline and Nia. In the same way, he never explains why there was an especially strong need not to testify about Jane. Kelly has failed to make any showing, much less a convincing one.

The district court did not abuse its discretion. The court took care to properly instruct the jury to consider the evidence for each count on its own merits. In turn, the jury did its part, convicting Kelly on six of the thirteen counts.

**C. Sentencing**

That leaves the sentence, which Kelly challenges on three fronts: two procedural, one substantive. First, Kelly disagrees with the district court's discussion of acquitted obstruction of justice conduct at sentencing. Second, he takes issue with the district court's reference to present-day Guidelines ranges, which punish sex crimes more harshly than those in place when he committed the offenses, in imposing the variance up to 240 months. Finally, and more generally, he contends that the sentence is too harsh as a substantive matter.

On acquitted conduct, Kelly concedes—as he must—that district courts may include such conduct in the calculation without offending due process. *See United States v. McClinton*, 23 F.4th 732, 735 (7th Cir. 2022). Instead his quarrel lies with the district court's statement at sentencing that "there certainly was evidence that I could find by preponderance that he obstructed justice." As Kelly notes, relevant conduct at

sentencing "may include uncharged or acquitted conduct as long as the court makes specific findings identifying the relevant conduct based on a preponderance of the evidence." *United States v. Oros*, 578 F.3d 703, 711 (7th Cir. 2009).

Kelly's argument boils down to a complaint that the district court included acquitted conduct without making those "specific findings." Like other procedural challenges to sentencing, we review de novo. *United States v. Rollerson*, 7 F.4th 565, 570 (7th Cir. 2021). The transcript defies Kelly's characterization, for the district court never relied on any obstruction of justice as relevant conduct. Rather, it soundly grounded the sentence in the 18 U.S.C. § 3553(a) factors: the district court expounded on "the seriousness of the offense," Kelly's "history and characteristics," and the prospects of deterring Kelly and protecting the public from similar offenses in the future. The district court's aside that it "*could* find" obstruction by a preponderance does not undermine the district court's evaluation of the § 3553(a) factors, which justifies the sentence and supplies an adequate rationale. The district court thought it unnecessary to make such a finding precisely because it had chosen not to rely on obstruction of justice in imposing Kelly's sentence.

The district court's variance from the advisory Guidelines range is likewise free from error. After correctly calculating Kelly's Guidelines range using the Guidelines in place at the time Kelly committed the offenses, the court gestured at the current version of the Guidelines. It stated: "because of the increase in the current Guidelines … in all probability, if I was sentencing Mr. Kelly … I would probably give him a sentence in the neighborhood of 240 months." It explained that this represents "a variance upwards from the top end of the

Guidelines, which was 168." So the district court properly calculated the range and then used the current Guidelines to justify a variance.

We have held—as Kelly acknowledges—that "a sentencing court may consider subsequent Guideline amendments" for certain purposes. *United States v. Coe*, 220 F.3d 573, 578 (7th Cir. 2000). These, *Coe* established, include considering later-added aggravating elements and "consider[ing] later amendments as guides for determining how much of a departure is warranted." *Id.* We went so far as to add that "reference to subsequent amendments may be one of the best ways a sentencing court can be assured that the magnitude of a departure is consistent with the sentencing scheme envisioned by Congress." *Id.* By extension, changes to the Guidelines may also inform a variance. Variances have supplanted the departures *Coe* envisioned now that "the concept of a departure … is obsolete and beside the point after *United States v. Booker*, 543 U.S. 220 (2005)." *United States v. Gardner*, 939 F.3d 887, 891 (7th Cir. 2019) (cleaned up). Yet "district courts can still take guidance from the departure provisions and apply them by way of analogy." *United States v. Pankow*, 884 F.3d 785, 793 (7th Cir. 2018) (cleaned up). It follows that updates to the Guidelines may justify a variance—as the district court did here, tying its variance to "the sentencing scheme envisioned by Congress" in "one of the best ways" possible. *Coe*, 220 F.3d at 578. That was no error.

We review the substantive reasonableness of Kelly's sentence only for abuse of discretion. *Rollerson*, 7 F.4th at 570. A sentence's substantive reasonableness turns on "the totality of the circumstances, including the extent of any variance from the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51

(2007). Kelly challenges the 72 months added to the high end of his Guidelines range. That challenge is beside the point. What matters most is the 30-year New York sentence, which the district court called "the elephant in the room" at sentencing. The sentence Kelly ultimately received was fashioned with the New York sentence in mind. Kelly's nominal above-Guidelines sentence cannot be fairly assessed without reference to its running concurrently with the New York sentence—what looks like 240 months for this Illinois conduct is, with that context, more like twelve.

Even without that, though, the district court did not abuse its discretion in imposing an above-Guidelines sentence. In its words, "the nature of [Kelly's] offense is horrible, horrific." It considered Kelly's arguments in mitigation and weighed the 18 U.S.C. § 3553(a) factors in detail. We will not second-guess that exercise of discretion.

### III. Conclusion

An even-handed jury found Kelly guilty, acquitting him on several charges even after viewing those abhorrent tapes. No statute of limitations saves him, and the resulting sentence was procedurally proper and—especially under these appalling circumstances—substantively fair.

AFFIRMED.